IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| LEAVITT GREAT WEST INSURANCE SERVICES, LLC, a Montana Limited Liability Company, | CV 25–24–H–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| KRYSTA THERIAULT, an individual; and ALLIANT INSURANCE SERVICES, INC. a California Corporation, | |
| Defendants. | |

Before the Court is Defendants Krysta Theriault ("Theriault") and Alliant

Insurance Services' ("Alliant") (collectively, "Defendants") Motion to Dismiss

Plaintiff Leavitt Great West Insurance Services' ("Leavitt") First Amended

Complaint ("Complaint") (Doc. 18). (Doc. 20.) The Court issues its Order without

oral argument. For the reasons herein, the Motion to Dismiss is DENIED.

**BACKGROUND**[1]

As a general rule, the Court "may not consider any material beyond the

pleadings in ruling on a Rule 12(b)(6) motion." *United States v. Corinthian*

---

[1] The following facts are taken from Leavitt's First Amended Complaint (Doc. 18) and are assumed true for purposes of resolving the Motion.

1

*Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (citation omitted). The Court may, however, consider materials on which the complaint "necessarily relies" if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* at 998.

Here, the Court may consider Leavitt's Employment Agreement with Theriault, signed June 1, 2016 (the "Agreement") (Doc. 18-1), because this document is referenced in and attached to the Complaint, central to Leavitt's claims, and its authenticity is not questioned by either Party. Therefore, the following facts are taken from the Complaint and the Agreement.

Leavitt operates in Montana as a subsidiary of a nationwide insurance brokerage which employs agents across the country. (Doc. 18 ¶¶ 7–8.) Theriault worked for Leavitt from on or about June 1, 2016, until on or about May 17, 2024, when she left Leavitt and joined Alliant. (*Id.* ¶ 19.) Alliant is a competitor of Leavitt and its affiliates. (*Id.* ¶ 9.)

The Agreement prohibited Theriault from "directly or indirectly pirat[ing] an account from [Leavitt]" and from "disclos[ing] confidential information about clients or accounts covered by [the Agreement.]" (Doc. 18-1 at 5.) To "Pirate an Account" is defined as follows:

> [I]f Employee . . . does any of the following . . . (d) Discloses confidential client information or other valuable trade secrets concerning the insurance accounts to any person competing with [Leavitt], whether such disclosure is compensated or uncompensated.

2

(*Id*. at 3.) These restrictions commenced on the Agreement's effective date and continued "for eighteen (18) months following the termination of [the Agreement.]" (*Id*. at 5.)

During her final weeks at Leavitt, Theriault compiled and emailed herself a list of at least sixteen clients, including assigned producers, policy renewal dates, quote statuses, other pending information, and action items for each account. (Doc. 18 ¶ 26.) She also communicated with Client A on Alliant's behalf, informed Client A directly or indirectly of her impending departure, and facilitated the execution of a Broker of Record form transferring Client A's business from Leavitt to Alliant. (*Id*. ¶ 25.) Since leaving Leavitt, Theriault has sold and serviced insurance for Client A through Alliant and may have done so for other former Leavitt clients. (*Id*. ¶¶ 28, 29, 31.)

The Complaint alleges that Alliant was aware of the nature and terms of Leavitt's employment agreements when it engaged with Theriault regarding her departure from Leavitt, and that Alliant encouraged and participated in the transfer of Client A's business while knowing it was a Leavitt account and Theriault was still a Leavitt employee. (*Id*. ¶¶ 41–42.) The Complaint further alleges Alliant induced Theriault to solicit Client A on its behalf and facilitate the move during her final weeks on Leavitt's payroll. (*Id*. ¶¶ 25, 42.)

Leavitt brings four causes of action: breach of contract against Theriault; tortious interference with contractual rights against Alliant; and two counts of trade secret misappropriation—one under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq., and one under the Montana Uniform Trade Secrets Act ("MUTSA"), Mont. Code Ann. §§ 30-14-401 et seq. (Doc. 18 ¶¶ 21–76.) Leavitt filed the operative Complaint on April 15, 2025. (Doc. 18.) On April 28, 2025, Defendants moved to dismiss the trade secret claims, Counts III and IV, for failure to state a claim under Rule 12(b)(6). (Doc. 20.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts generally limit their considerations under this standard to the allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–59 (2007). Those allegations are accepted as true and viewed in a light most favorable to the plaintiff. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*,

550 U.S. at 555 (citations omitted). Thus, plaintiffs must include enough facts in their complaint to make it plausible, not merely possible or conceivable, that they will be able to prove facts to support their claims. *Twombly*, 550 U.S. at 555–56.

## DISCUSSION

To state a claim for trade secret misappropriation under the DTSA and MUTSA, a plaintiff must allege that: (1) it possessed trade secrets, 18 U.S.C. § 1839(3); (2) the trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce", *id*. § 1836(b)(1); (3) the defendants misappropriated those trade secrets, *id*. § 1839(5); and (4) the misappropriation caused damage, *Alta Devices, Inc. v. LG Electronics, Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018). Because elements of trade secret misappropriation under the DTSA and MUTSA are substantially the same, and because the parties do not distinguish between them, the Court will analyze both claims together under the same standard. *See Weinberger v. 911 Datamaster, Inc.*, No. CV 18-134-M-DWM, 2019 WL 4170301, at *5 (D. Mont. Sept. 3, 2019) (consolidating the analysis of the DTSA and MUTSA claims).

Although "Rule 8 does not have a particularity requirement", *Alta Devices,* 343 F. Supp. 3d at 882, at the motion to dismiss stage in a trade secrets case, "a plaintiff's burden . . . is to identify at least one trade secret with sufficient particularity to create a triable issue." *Genasys Inc. v. Vector Acoustics, LLC*, 638

F. Supp. 3d 1125, 1153 (N.D. Cal. 2022).[2] This analysis turns on whether the plaintiff has described the trade secret with enough particularity "'to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade[,]'" *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)).

A plaintiff "is not required to disclose the details of its trade secrets in the [Complaint]." *7EDU Impact Academy Inc. v. You,* 760 F. Supp. 3d 981, 993 (N.D. Cal. 2024).[3] However, she must still "describe the subject matter of the trade secret with sufficient particularity to . . . permit the defendant to ascertain at least the

---

[2] The "sufficient particularity" standard can be traced to *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 252, 67 Cal.Rptr. 19 (Cal. Ct. App. 1968). In *Oakwood Laboratories LLC v. Thanoo*, the Third Circuit explains that "[t]he discussion in *Diodes* regarding trade secret identification serves to explicate substantive law, not merely procedure, as it deals with what constitutes a plausible pleading of one of the elements of a trade secret misappropriation claim. As such, it has been widely adopted by federal courts." 999 F.3d 892, 906 n. 14 (3d Cir. 2021).

[3] "The federal DTSA does not require a plaintiff to identify with particularity its alleged trade secrets from the start[,]" and in fact the "DTSA does not set out requirements for the specific timing or scope for identifying trade secrets." *Quintara Biosciences, Inc.*, 149 F.4th at 1085, 1089. "[T]he conventional order of pleadings, initial disclosures, and first-round discovery may not be enough to set the stage for future factual development of a trade-secret claim." *Id*. at 1088. "So whether a plaintiff has sufficiently particularized a trade secret under DTSA is usually a matter for summary judgment or trial." *Id.* at 1085.

boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F.Supp. 3d 868, 880–81 (N.D. Cal. 2018).

Defendants present two primary arguments in favor of dismissal. First, that Leavitt has not adequately alleged it owns a trade secret because (1) the information alleged to be a trade secret is not protectable under the DTSA or MUTSA (Doc. 23 at 8), and (2) the alleged trade secrets are not described with sufficient particularity (Doc. 21 at 14). Second, that the Complaint lacks factual allegations showing any misappropriation by Defendants.[4]

## I. Plaintiff Adequately Pled Ownership

Defendants first argue that the Plaintiff failed to adequately allege it owns trade secrets. (Doc. 21 at 13–18.) The Court disagrees.

To plead ownership, Leavitt must (1) "sufficiently identify the information it claims as a trade secret" and (2) "allege facts supporting the assertion that the information is indeed protectable as such." *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (discussing 18 U.S.C. § 1839(3)).

---

[4] It is not disputed that the information at issue, if protected as trade secrets, relates to a product intended for use in interstate or foreign commerce as pled in the Complaint. (Doc. 18 at ¶56.) The Defendants also do not dispute the Plaintiff's assertions of specific types of damages, only the grounds on which the assertions rest. (Doc. 18 at ¶¶ 63–66, 73–76) (Plaintiff asking for compensatory and punitive damages, restitution, and attorney's fees.)

The term "trade secret" consists of three essential components: (1) information, (2) that derives independent economic value from not being generally known or readily ascertainable through proper means, and (3) is the subject of reasonable measures to maintain its secrecy. 18 U.S.C. § 1839(3); Mont. Code Ann. § 30-14-402(4). Defendants challenge the sufficiency of all three components. (*See* Doc. 21 at 13–18.) The Court addresses each in turn.

### A. The Complaint Identifies Information within the Meaning of the Acts

The DTSA defines a trade secret as encompassing:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

18 U.S.C. § 1839(3). The Act's inclusive approach to what qualifies as information is evident in its use of the phrase "all forms and types" of the specified categories, combined with a non-exhaustive illustrative list. *See Quintara Biosciences*, 149 F.4th at 1089 ("Trade-secret cases 'start from the important premise that the definition of what may be considered a "trade secret" is broad.'") (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 657 (9th Cir. 2020)).

Defendants contend that "insurance accounts" and Leavitt's "book of business" describe client relationships, not information about the client relationships, and that only the latter falls within the meaning of "information"

8

under the Acts. (Doc. 23 at 4–5.) The Court disagrees that Leavitt merely defines its trade secrets as the clients or client relationships themselves. (*See* Doc. 18 ¶¶ 18, 26, 55.)

The Agreement defines the "book of business" as "all accounts, files, and expirations owned or controlled by [Leavitt]." (Doc. 18-1 at 1.) The Agreement defines "Files" as "[a]ll information stored about a client[.]" (*Id.* at 2.) Furthermore, the Agreement specifies that "[a]ccounts . . . shall include all insurance policies, surety bonds, or other financial products and services provided to or for a named insured of [Leavitt]." (*Id.*) Files and accounts therefore appear to be data, not relationships, and Defendants fail to provide citations supporting their argument that such data does not qualify as "information" under the Act. (Doc. 23 at 8.)

Accordingly, the Court finds that the Complaint identifies information within the meaning of the Acts. *See* 18 U.S.C. § 1839(3); Mont. Code Ann. § 30-14-402(4).

### B. The Information Identified is Sufficiently Pled as Protectable Trade Secrets

Defendants also challenge the basis for why trade secret protection should apply. (Doc. 21 at 14–17.) For information to be protectable as a trade secret it must (1) derive independent economic value from (2) not being generally known or readily ascertainable, and (3) the subject of reasonable efforts to maintain its

secrecy. 18 U.S.C. 1839 (3); Mont. Code Ann. § 30-14-402(4). Importantly, however, "the Court need not decide on a motion to dismiss whether some parts of the alleged trade secret may, after discovery, not qualify as a trade secret." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 75–76 (N.D. Cal. 2020).

### i. Independent Economic Value is Adequately Pleaded

Defendants argue that the Complaint fails to allege facts showing how each purported trade secret derives independent economic value from not being generally known. (Doc. 23 at 8.)

"To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (citation and quotation marks omitted). "Independent economic value can be shown by circumstantial evidence" such as "the resources invested in producing the information" and "the precautions taken to protect its secrecy[.]" *Id*.

"The standard to show that trade secrets derive economic value is not a high standard." *Id*. at *4. In *Calendar Research*, the plaintiff alleged that the trade secrets "enable the creation of economically successful applications for use on mobile phones and the Web. Such creation and development would be less profitable without the expedited and simplified development processes inherent in

10

these trade secrets." *Id*. The court found this allegation sufficient, holding "[d]efendant's motion to dismiss fails on this prong." *Id*. Consistent with this low bar, in *Fuhu, Inc. v. Toys "R" Us, Inc.*, the allegation that a trade secret "has actual or potential independent economic value because it was secret" was sufficient to survive a motion to dismiss. 2013 WL 12097569, at *9 (S.D. Cal. Mar. 1, 2013).

Similarly, here, Leavitt's Complaint alleges the identified information "derive[s] independent economic value from not being generally known and not being readily ascertainable by proper means." (*Id*. ¶ 68.) The Complaint further alleges that the compiled client data and "notes about customer preferences" (*id*. ¶¶ 26, 55, 58, 68, 70) provide a "competitive advantage" (*id*. ¶¶ 39, 59, 71) that Alliant would not have possessed through proper means (*see id*. ¶ 68). These allegations are sufficient at this stage. *See Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1171–72 (N.D. Cal. 2020) (concluding that trade secret allegations were "sufficiently pled" where a complaint identified "client preferences" and "internal notes regarding particular clients' expectations and preferences" as being among the information misappropriated).

### ii. The Complaint Adequately Alleges Reasonable Measures to Maintain Secrecy.

Defendants do not directly challenge the measures Leavitt took to protect its trade secrets. They do, however, argue that Leavitt's trade secret allegations are "grossly deficient" because they extend beyond the categories contractually

11

designated as "confidential client information" in the Agreement. (Doc. 21 at 14; Doc. 23 at 6.) While the contractual definition is relevant to the reasonable measures inquiry, this is not a dispositive factor, and it does not set the ceiling on what the statutes protect. *See Alta Devices, Inc. v. LG Electronics*, *Inc.*, 343 F.Supp.3d 868, 880 (N.D. Cal. 2018) ("the presence of a contract is an allegation that may support a finding of reasonable measures, but an expired contract does not automatically render any information incapable of receiving trade secret[] protection.") Defendants do not point to any case law that supports otherwise.

Leavitt alleges that it protected its trade secrets by requiring employees to sign confidentiality agreements, limiting access to systems and data based on role necessity, requiring individual credentials with regular permission reviews, and implementing policies prohibiting disclosure, mandating return of files and equipment upon termination, and requiring compliance with data protection standards. (Doc. 18 ¶ 57.) At this stage, these facts are sufficient to allege Leavitt has taken reasonable measures to keep the relevant information secret. *See Allstate Insurance Company v. Fougere*, 79 F.4th 172, 187, 192 (1st Cir. 2023) (A plaintiff need not take "heroic measures" to preserve confidentiality; rather, the inquiry focuses on whether the plaintiff undertook an "active course of conduct" reflecting reasonable efforts under the circumstances.).

### iii. Some Information Being Publicly Available Does Not Automatically Defeat Trade Secret Protection.

Defendants argue that Counts III and IV must be dismissed because Leavitt has failed to allege facts showing its trade secrets are beyond general knowledge. (Doc. 21 at 16–17.) Specifically, Defendants contend that client names, contact information, and plan assets are publicly available through Form 5500 filings with the U.S. Department of Labor, and that public-sector clients such as school districts and community hospitals disclose their contact and benefits information on the internet. (Doc. 21 at 16–17.) Defendants further argue that clients are free to share their own insurance purchasing histories and preferences with competitors. (Doc. 21 at 16.)

The public availability of components of a trade secret is not dispositive. *See Allstate Ins. Co. v. Fougere*, 79 F.4th at 189 ("The publicly accessible nature of certain portions of the spreadsheets certainly informs [the] trade secret analysis . . . . However, it is not dispositive."); *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1092 (10th Cir. 2025) ("A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unique combination affords a competitive advantage and is a protectable secret."). Similarly, that a client may independently disclose some of its own information does not render Leavitt's internal compilation of relationship-specific data publicly available or readily ascertainable. *See Albert's Organics, Inc. v.*

13

*Holzman*, 445 F. Supp. 3d 463, 473 (N.D. Cal. 2020) ("Courts have frequently held that customer-related information qualifies as a trade secret.").

The alleged trade secrets here consist of a compiled body of information reflecting Leavitt's internal knowledge of its client relationships. (*See* Doc. 18 ¶¶ 26, 55.) Even if individual components of that compilation could be ascertained through public sources, the compilation itself may still constitute a protectable trade secret, *see Double Eagle Alloys*, 134 F.4th at 1092; therefore, Defendants' public availability argument does not compel dismissal.

## II. The Identified Trade Secrets are Described with Sufficient Particularity.

Defendants characterize Leavitt's description of its trade secrets as a "grossly deficient" list of "general business terms" that fails to identify the information at issue with any particularity. (Doc. 21 at 14.) Specifically, they argue that the Complaint (1) describes the alleged trade secrets in terms too vague to identify the information at issue and (2) does not specify which trade secrets were allegedly misappropriated. (Doc. 21 at 15–16.) The Court disagrees with the first proposition and is not convinced the second has any bearing at this stage.

Defendants liken Leavitt's descriptions to the broad, categorical labels found to be insufficient in *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018), and demand that Plaintiff distinguish *Vendavo* from the case

at bar.[5] (Doc. 23 at 6–7.) Although Plaintiff has failed to take part in this endeavor, the Court will do so here.

In *Vendavo*, the plaintiff broadly asserted that its trade secrets "include information not expressly covered by its patents," elaborating only to the extent of listing such categories as "source code, customer lists and customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, 'negative knowhow' learned through the course of research and development, and other information related to the development of its price-optimization software." *Id*. The court found the plaintiff's description insufficient because, rather than alleging any specific trade secrets, the plaintiff merely "set out its purported trade secrets in broad, categorical terms, more descriptive of the types of information that may qualify as protectable trade secrets than as any kind of listing of particular trade secrets [the plaintiff] has a basis to believe actually were misappropriated[]." *Id*. at *4.

Here, however, the Complaint alleges that "the book of business serviced by Theriault during her employment with Leavitt, confidential client information,

---

[5] Defendants also argue dismissal is proper in light of *Synopsys, Inc. v. ATopTech, Inc.*, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013). (Doc. 23 at 6–7.) *Synopsys*, however, arose solely under the California Uniform Trade Secrets Act and is therefore distinguishable on that basis alone. *See Quintara Biosciences, Inc. v Ruifeng Biztech, Inc*, 149 F.4th 1081 (9th Cir. 2025) ("DTSA requires a plaintiff to identify a trade secret with 'sufficient particularity' as a matter of fact, unlike CUTSA's 'reasonable particularity' rule.")

customer purchasing histories, notes about customer preferences, marketing leads, and related data constitute trade secrets under the [DTSA]." (Doc. 18 ¶ 55.) This allegation identifies the trade secrets at issue as the full body of client-related information produced, serviced, and maintained by Theriault during her employment.

The Agreement further elaborates on what this body of information covers. For example, "confidential client information" is a defined term that includes: "Policy expiration dates; Premium and Commission amounts; Policy and Endorsement forms used; Insured's property schedules; Rating credits applied; Risk classifications applied; Loss histories and records; Coverage face amounts; Coinsurance and deductible factors; Customer files; and Customer names." (Doc. 18-1 at 2 (cleaned up).) The "book of business" is defined as "all accounts, files, and expirations owned or controlled by [Leavitt]." (*Id.* at 1.) Each component of that definition is itself specifically delineated: "accounts" encompasses "all insurance policies, surety bonds, and other financial products and services provided to any named insured of [Leavitt]" (*id.* at 2); "files" includes "all information stored about a client, whether stored in paper or electronic form" (*id.*); and "expirations" include not only the date coverage ends but also "the right to seek renewal and to receive renewal commissions" (*id.*).

The Complaint further alleges that Theriault "compiled and emailed to herself a list of at least sixteen clients, the producers assigned to them, policy renewal dates, the status of quotes and other pending information, and action items for each of the accounts." [6] (Doc. 18 ¶ 26.) And at least one specific client, Client A, is identified as an account within this body of information whose business was actually transferred to Alliant. (*Id.* ¶ 25.)

Defendants' next argument fares no better. Relying on a footnote from *Negative, Inc. v. McNamara*, 2025 WL 814755, at \*7 n.2 (E.D.N.Y. Mar. 13, 2025), for the general proposition that allegations about misappropriation of "trade secrets" need not be accepted as true because they are legal conclusions, Defendants assert that the Complaint fails to identify "which" of the described trade secrets were allegedly misappropriated. (Doc. 21 at 15.) That footnote, however, is a general observation about pleading standards—the *Negative, Inc.* court did not hold, or even suggest, that a plaintiff must specifically identify which specific trade secrets were misappropriated. Rather, *Negative, Inc.* turned on the wholly separate question of whether the plaintiff had taken reasonable measures to protect its information. *See Negative, Inc. v. McNamara*, 770 F. Supp. 3d 472.

---

[6] Defendants argue that this information impermissibly expands on what is protected by the Agreement. (Doc. 21 at 14.) However, it seems that this information, if "stored" could fall under the Agreements definition of "File" which includes "all information stored about a client[.]" (Doc. 18-1 at 2.)

On this point, the Court finds *Navigation Holdings, LLC v. Molavi* persuasive, wherein the court encountered, and rejected, a similar "*which*" argument as Defendants make here. 445 F. Supp. 3d 69, 75–76 (N.D. Cal. 2020). In that case, the defendants argued that plaintiffs must "distinguish the trade secrets they allege were misappropriated from the more nebulous, larger bucket of confidential information"; in response, the court found that "[s]uch a rule is not supported by case law." *Id*. As was the case in *Navigation Holdings*, "Defendants do not cite any cases that have dismissed a trade secret misappropriation claim for this reason." *Id*.

At this stage of the proceedings, the question is whether "[t]he plaintiff [has] 'describe[d] the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge . . . and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Vendavo, Inc.*, 2018 WL 1456697, at *4. The Court finds the Plaintiff has satisfied this burden. The Complaint describes the trade secrets with sufficient particularity to separate them from matters of general knowledge in the insurance brokerage industry and puts both Defendants on notice of what the alleged theft is about. *See Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1171 (N.D. Cal. 2020) ("the basic test is (1) whether something beyond general knowledge is being claimed

and (2) whether there is enough specificity to put the defendant on notice of what the theft is about.").

Accordingly, the Court concludes that Leavitt has identified its alleged trade secrets with sufficient particularity to survive the motion to dismiss.

**III. Leavitt Adequately Pled the Misappropriation of Trade Secrets.**

Defendants argue that the Complaint fails to allege any facts showing improper acquisition, use, or disclosure of a trade secret by Theriault or Alliant. (Doc. 21 at 18.) The Court disagrees.

"The DTSA 'contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use.'" *Robillard v. Opal Labs, Inc.*, 428 F. Supp. 3d 412, 452 (D. Or. 2019) (citation omitted); *see also* Mont. Code Ann. § 30-14-402(2) (providing a similar framework under MUTSA).

Because the statutes provide alternative theories of liability, Leavitt need only adequately plead one path for each Defendant. Although Leavitt does not specify which theory applies to which Defendant, the Court concludes that Theriault's conduct satisfies misappropriation through disclosure/use under § 1839(5)(B)(ii)(II), and that Alliant's conduct satisfies misappropriation through acquisition under § 1839(5)(A). The Court's analysis of a single theory for each Defendant does not foreclose liability under an alternative theory.

**A. Theriault—Use and Disclosure Under § 1839(5)(B)(ii)(II)**

First, as to disclosure/use, Defendants argue that the Complaint does not "include any factual allegations showing that Theriault improperly used or disclosed trade secrets to solicit or service clients or otherwise." (Doc. 22 at 22.) It seems that Defendants' argument focuses on whether Theriault emailing herself the client list constitutes misappropriation. (*Id.* at 19.)

Under § 1839(5)(B)(ii)(II), misappropriation by use occurs when a person uses a trade secret without consent and knowing or having reason to know the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. 18 U.S.C. § 1839(5)(B)(ii)(II). The term "use" is construed broadly to encompass "all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021). Mere possession alone is not enough. *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 951 n.5 (N.D. Cal. 2003). What is required is actual use to the commercial detriment of the plaintiff. *Id.*

The Complaint alleges that during her final weeks at Leavitt, Theriault communicated with Client A on behalf of Alliant, informed Client A—directly or indirectly—of her impending departure, and facilitated the execution of a Broker of Record form transferring Client A's business from Leavitt to Alliant. (Doc. 18 ¶

25.) The operational knowledge required to identify Client A as a target and to understand the account relationship, assess the renewal timeline, and facilitate the execution of a Broker of Record transfer is precisely the kind of compiled, relationship-specific information the Complaint identifies as trade secrets—*i.e.*, information that surpasses the disclosure of public filings. The Complaint further alleges that during those same final weeks, Theriault compiled and emailed to herself a list of at least sixteen clients, the producers assigned to them, policy renewal dates, the status of quotes and other pending information, and action items for each account. (Doc. 18 ¶ 26.)

Defendants argue that rather than misappropriation, an equally plausible explanation is that Theriault left transition notes in her work email for Leavitt personnel to pick up after her departure. However, where "two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, [the] plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, accepting Leavitt's explanations as true, the Court finds the above-referenced allegations support a reasonable inference of misappropriation.

Defendants argue that absent an allegation the email was sent to a personal account, no improper means can be inferred. (Doc. 21 at 19.) This argument may have force in the acquisition context, where liability typically turns on an

affirmative act of taking—such as downloading to a personal device or transmitting to a personal account. *See Global Refining Group, Inc. v. PMD Analysis Inc.*, 2023 WL 5733968, at *6 (S.D.N.Y. 2023) (finding no misappropriation by acquisition where defendants lacked affirmative acts of improper taking, but holding liability nonetheless under use/disclosure theory). But misappropriation by use does not turn on where the information was stored or transmitted; rather, it asks whether Theriault employed Leavitt's trade secret information to obtain a competitive benefit. *See Oakwood Labs.*, 999 F.3d at 910. That question is answered independently by the conduct alleged with respect to Client A—Theriault's solicitation of that account on Alliant's behalf and facilitation of its transfer while still employed by Leavitt. (Doc. 18 ¶ 25.)

Moreover, courts have recognized that "use" is adequately pled when a plaintiff shows access to trade secrets combined with subsequent behavior that would be implausible to achieve without that information. *See Oakwood Labs.*, 999 F.3d at 910. The timing and pattern of Theriault's conduct supplies that inference here. Specifically, Theriault compiled a document containing sixteen client accounts, their producers, renewal dates, quote statuses, and action items during the same final weeks in which she was already communicating with Client A on Alliant's behalf and facilitating a Broker of Record transfer. (Doc. 18 ¶¶ 25, 26.) She then immediately joined Alliant in an analogous role servicing insurance

22

accounts. (Doc. 18 ¶ 19.) Where an employee compiles trade secret information and departs to a directly competing firm in a comparable role, it is reasonable to infer the information was intended for competitive use. *See 7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 997 (N.D. Cal. 2024) (reasonable to infer that files compiled "all at once" and "days before departure" were intended for use in new competing business where defendant continued in analogous role). Defendants fail to provide, and the Court is unaware of, any authority holding that this inference in the misappropriation by use context depends upon whether the email reached a personal account or remained within Leavitt's systems.

Defendants next argue that the Complaint fails to allege whether any clients left Leavitt following Theriault's resignation. (Doc. 21 at 23.) However, Client A's transfer is alleged to have occurred during Theriault's final weeks and while she was still employed by Leavitt but acting on Alliant's behalf. (Doc. 18 ¶ 25.) The DTSA does not limit misappropriation claims to post-resignation conduct. *See Auris Health, Inc. v. Noah Med. Corp.*, 2023 WL 7284156, at *4–5 (N.D. Cal. Nov. 3, 2023) (allegations, taken together with broader factual context, sufficient to allege plausible claims of misappropriation where employees downloaded "dozens of documents" during the last week of employment). The timing of the transfer, combined with Theriault's concurrent solicitation of Client A on behalf of Alliant, is precisely what the statute addresses. *See* 18 U.S.C. § 1839(5)(B)(ii)(II).

Finally, the Court finds that the Complaint adequately alleges that Theriault acted without Leavitt's consent and with knowledge of her duty to maintain secrecy. (Doc. 18 ¶¶ 60, 61.) The Complaint states directly that the misappropriation occurred "without the express or implied consent of Leavitt" and that "Theriault knew at the time of the misappropriation that the Agreement and Leavitt's policies required her to maintain the secrecy of the trade secrets and to limit their use." (*Id*.) Defendants counter that Theriault's access to the information was fully authorized during her employment and that authorized access negates any inference of improper means. (Doc. 21 at 14.) But the statutory duty at issue is not a duty to refrain from accessing information—it is a duty to maintain its secrecy and limit its use. See 18 U.S.C. § 1839(6)(A).

Therefore, the Complaint plausibly alleges that Theriault used and disclosed Leavitt's trade secrets in violation of § 1839(5)(B)(ii)(II) of the DTSA and the corresponding provisions of the MUTSA.

## B. Alliant—Acquisition Under § 1839(5)(A)

Finally, Defendants argue the Complaint is "devoid of any factual non-conclusory allegations showing that Alliant has improperly acquired, used, or disclosed any trade secrets." (Doc. 21 at 22.)

Section 1839(5)(A) requires that a plaintiff allege: (1) acquisition of a trade secret; (2) by a person who knows or has reason to know; and (3) that the trade

24

secret was acquired by improper means. 18 U.S.C. § 1839(5)(A). A defendant need not have personally used improper means—liability extends to one who acquires trade secrets knowing they were obtained through another's breach of a duty to maintain secrecy. *See* 18 U.S.C. §§ 1839(5)(B)(ii)(II)–(III); Mont. Code Ann. § 30-14-402(2)(b)(ii)(B)–(C). The Court will address each element in turn.

### i. Acquisition of a Trade Secret

Defendants argue that Leavitt fails to adequately plead the means by which they allegedly acquired the trade secrets. (Doc. 21 at 22–23.) Defendants are correct on this narrow point: the Complaint indeed only alleges that "Theriault has shared Leavitt's trade secrets with Alliant to help them gain a competitive advantage." (Doc. 18 ¶¶ 59, 71.)

However, allegations made upon information and belief are permissible where the underlying facts are "peculiarly within the opposing party's knowledge." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). How Theriault transmitted Leavitt's trade secret information to Alliant (*i.e.* whether by email, verbal disclosure, or otherwise) is likely information currently within Defendants' exclusive possession. *See Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3–4 (C.D. Cal. Aug. 16, 2017) (allegations of a defendant's use of trade secrets are properly made on information and belief because such information is often "not presumptively in the knowledge of the pleading party"). The question,

25

then, is whether this allegation is "based on factual information that makes the inference of culpability plausible." *Soo Park*, 851 F.3d at 928. The Court finds that it is. As discussed above, the Complaint alleges that during her final weeks at Leavitt, Theriault compiled and emailed to herself a list of at least sixteen clients, their producers, renewal dates, quote statuses, and action items. (Doc. 18 ¶ 26.) The Complaint further alleges that during those same weeks, she was already communicating with Client A on Alliant's behalf and facilitating its Broker of Record transfer. (Doc. 18 ¶ 25.) Finally, the Complaint alleges that Theriault failed to respond to Leavitt's demand for the return of all documents and information related to its book of business. (Doc. 18 ¶ 20.)

These allegations support a reasonable inference that the Defendants' actions were intended to ultimately assist Leavitt's competitor. (*See also Id.* ¶¶ 19, 42-43.) The existence of a specific compiled document containing trade secret information, in Theriault's possession at the moment of her departure to Alliant, combined with the transfer of at least one client whose account was on that list, makes it plausible, not merely conceivable, that the information made its way to Alliant. That is all that the plausibility standard requires. *See Iqbal*, 556 U.S. at 678.

### ii. Knowledge That the Trade Secrets Were Acquired by Improper Means

The DTSA defines "improper means" to include "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). Alliant need not

have personally engaged in improper conduct—it is sufficient that Alliant knew or had reason to know that Theriault's disclosure of Leavitt's trade secrets involved a breach of her duty to maintain their secrecy. *See* 18 U.S.C. § 1839(5)(A); *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. 2019) (employee's transmission of trade secrets followed by resignation to join a competitor constitutes misappropriation where the employee "knew, or should have known, his disclosure and use of employer's trade secrets was improper").

The Complaint alleges that Alliant had engaged in at least three prior disputes with Leavitt involving this exact pattern of conduct—i.e., poaching Leavitt employees and absorbing the corresponding books of business. (Doc. 18 ¶¶ 10–12.) Each time, Alliant was specifically notified of its interference with Leavitt's employment contracts and paid to resolve the dispute. (*Id.* ¶¶ 11–12.) As a direct result of those disputes and resulting settlement agreements, Alliant knew or had reason to know of the nature and terms of Leavitt's employment agreements, including their confidentiality requirements, at the time it was engaging with Theriault regarding her departure. (*Id.* ¶¶ 13, 40.) Moreover, Alliant knew Client A was a Leavitt client. (*Id.* ¶ 41.) Alliant also knew the transfer occurred while Theriault was still employed by Leavitt. (*Id.*) And Alliant intentionally encouraged, participated in, and induced Theriault's breach. (Doc. 18 ¶ 42.)

This is not mere recruitment of a competitor's employee. *Cf. Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1182 (W.D. Wash. 2019) (mere recruitment of a competitor's employees, without more, does not satisfy the knowledge requirement under the DTSA). The Complaint alleges that Alliant's prior conduct was not inadvertent: it "deliberately proceeded to act in conscious or intentional disregard of or indifference to the high probability of injury to Leavitt." (Doc. 18 ¶ 48.) The Complaint further alleges that Alliant's knowledge of Leavitt's agreements with its employees meant that Alliant knew the trade secrets "were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use." (*Id.* ¶ 72.) Taken together, these allegations plausibly establish that Alliant knew or had reason to know that any trade secret information it received from Theriault was acquired through a breach of her duty to maintain its secrecy— conduct that falls squarely within the statutory definition of improper means. 18 U.S.C. § 1839(6)(A).

The pattern of conduct, the documented knowledge, and the timing permit a reasonable inference that Alliant knowingly participated in the misappropriation of Leavitt's trade secrets. The Complaint plausibly alleges that Alliant acquired Leavitt's trade secrets. 18 U.S.C. § 1839(5)(A); accord Mont. Code Ann. §§ 30-14-401 et seq.

## CONCLUSION

The Court finds that Leavitt has adequately pled misappropriation of trade secrets under Counts III and IV of the Complaint. Accordingly, for the reasons stated above,

IT IS ORDERED that Defendants' Motion to Dismiss (Doc. 20) is DENIED.

DATED this 6th day of April, 2026.

_____
Dana L. Christensen, District Judge
United States District Court